**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 18 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITD STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KENNETH MARK COOK,

      Petitioner - Appellant,

v.

DAVID McKUNE and THE
ATTORNEY GENERAL OF THE
STATE OF KANSAS,

      Respondents - Appellees.

No. 01-3106

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 97-CV-3214-DES)**

---

Chanda Feldkamp and Sherri L. Schuck, Legal Interns, (Jeffrey A. Wells, Legal Intern, Matt Wilson, Legal Intern, and John J. Francis, Supervising Attorney, with them on the briefs), Washburn Law Clinic, Washburn University School of Law, Topeka, Kansas, for Petitioner-Appellant.

Jared S. Maag, Assistant Attorney General, Criminal Litigation Division, Office of the Kansas Attorney General, Topeka, Kansas, for Respondents-Appellees.

---

Before **HENRY**, **McKAY** and **GIBSON**,[*] Circuit Judges.

---

[*]The Honorable John R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

**GIBSON**, Senior Circuit Judge.

Kenneth Cook appeals from the denial of his petition for habeas corpus challenging the constitutionality of his conviction in Kansas for the murder of Charles Duty. Of the two witnesses who testified that they were present at the murder, only one, David Rudell, testified that Cook committed the murder. Rudell was not present at the trial. Instead, the trial court found that Rudell was unavailable to testify at trial, and his preliminary hearing testimony was read into the record. Cook contends that the use of Rudell's prior testimony violated Cook's Sixth Amendment right to confront the witnesses against him. We reverse and remand with directions to grant the writ.

Charles Duty's body was found floating in the Wakarusa River near Topeka, Kansas on September 13, 1992. The body was tied to a steel bar. Duty had two gunshot wounds, one of which had killed him. The bullets were of an unusual type. The teeth had been removed from Duty's mouth, and a patch of skin had been removed from each arm. The investigation into Duty's death first focused on Gerald Delay, who had stayed at Cook's house at 107 Lime Street in Topeka briefly the week before Labor Day, September 7, 1992. After police questioning, Delay confessed to helping Cook kill Duty. Delay was charged with the murder, and Cynthia Sewell, of the public defender's office, was appointed to represent him.

The investigation took another turn when Leonard Smith approached the Kansas Bureau of Investigation with information regarding the murder. Smith testified at an inquisition that Cook had told him Cook had killed Duty with Smith's 31 caliber at 107 Lime and that David Rudell had been there in the bathroom at the time.

By the time of Smith's inquisition, David Rudell had fled Kansas. The District Attorney located Rudell in California, had a warrant issued for him under the Uniform Act to Secure Attendance of Witnesses from Without State, Kan. Stat. Ann. § 22-4203, and brought him back to Kansas. Rudell testified at an inquisition that he had driven Cook and Elizabeth Hebert to the house at 107 Lime Street in Topeka on Labor Day 1992, which would have been September 7, 1992, to move their furniture out of the house. Elizabeth Hebert identified herself as Cook's common-law wife. Duty had been staying with Cook and Hebert at 107 Lime, and on the way to the house, Cook told Rudell that Hebert had stolen drugs from Duty. Cook was "packing" a cap-and-ball 31 caliber pistol, and Rudell surmised that Cook was anticipating a confrontation with Duty. Once they arrived at the house, Cook went inside while Rudell turned his truck around to make it easier to load the furniture. Rudell noticed Hebert looking in the window of the house. She was crying and she said, "He shot him." Rudell went inside and saw Duty lying in bed, dead, with a bullet hole in his chest. There was gun

smoke in the air and Cook had the gun in his hand. Cook dragged the body to the garage, where he removed the teeth with pliers and cut the tattoos off. Rudell drove Cook and Hebert to a motorcycle shop called the Tin Shed. Cook went behind the shop and came back with a length of steel tubing. They returned to 107 Lime and loaded the body into Rudell's truck. They drove to a deserted spot on the Wakarusa River, where Cook got out and dragged the body, tied to the steel pipe, into the river.

At the inquisition, Rudell testified that Gerald Delay had also been staying with Cook and Hebert at 107 Lime Street the week before Labor Day, but that Delay was not at the house during the killing. He said that Delay stopped by the house during the afternoon of the killing to pick up his belongings, but that the body was in the garage by the time Delay showed up and Delay did not know it was there.

As a result of Rudell's testimony at the inquisition, the District Attorney dismissed the murder charge against Delay and granted Rudell immunity from prosecution for anything other than first-degree murder in connection with the events of September 1-9, 1992.

Rudell reiterated the key points from his inquisition testimony at Cook's preliminary hearing, where he was cross-examined by Cook's lawyer, but he did not return to Kansas for Cook's trial. The State sought to introduce Rudell's

preliminary hearing testimony under the exception to the hearsay rule for prior testimony of an unavailable witness, Kan. Stat. Ann. § 60-460(c). The court ruled without an evidentiary hearing that Rudell was unavailable as a witness, and reconfirmed that decision again when Cook's lawyer asked for reconsideration on the ground that it was necessary to take evidence on whether the State had been diligent in trying to secure Rudell's attendance.

The court then held a hearing on Cook's objection that he was deprived of an adequate opportunity to cross-examine Rudell at the preliminary hearing. Cook's objection was that his attorney first learned some time after the preliminary hearing that Rudell was engaged in an intimate relationship with Cynthia Sewell, the lawyer for Gerald Delay. After hearing testimony from Sewell and from the District Attorney on the nature and timing of the Sewell-Rudell relationship, the time-frame when the relationship became known to the District Attorney, and the substance of communications between Sewell and Rudell pertaining to the Cook case, the trial court decided to admit the preliminary hearing testimony. The court held that the District Attorney did not fail to disclose exculpatory evidence to Cook, since she did not learn of the relationship until after the close of the preliminary hearing and she informed his counsel of the Sewell-Rudell relationship more than five months before trial. The court further held that Cook was not prejudiced by being unable to cross-

examine Rudell about his relationship with Delay's attorney because Sewell testified that she and Rudell did not discuss any substantive aspect of Rudell's testimony.

So, Rudell's preliminary hearing testimony was read to the jury. The only other witness at trial who claimed to have been present at the killing was Elizabeth Hebert. She testified that Leonard Smith had killed Duty on the Tuesday after Labor Day. Leonard Smith testified that Cook had borrowed his antique reproduction 31 caliber cap-and-ball pistol, and that Cook came by his house the Friday before Labor Day to get fresh ammunition for the gun. Smith said that on that Friday Cook asked Smith to "run a guy off" from the Lime Street house because "Beth had beat him for a bag of dope, pills." Smith also testified that Cook later told him that he had "capped" Duty in the chest three times while Duty was asleep on Labor Day. A former roommate of Rudell's testified that he saw Cook cleaning and loading a black powder gun at Rudell's house. There was no physical evidence linking Cook, Smith, or for that matter, Delay to the killing.

The jury convicted Cook of first-degree murder, and he was sentenced to imprisonment for life without possibility of parole for forty years.

On appeal, the Kansas Supreme Court affirmed the conviction, but vacated the sentence for lack of evidence of aggravating factors. State v. Cook, 913 P.2d 97, 118 (Kan. 1996). Cook was resentenced to fifteen years to life.

Cook filed this habeas petition claiming that his Sixth Amendment right to confront the witnesses against him was violated by introducing Rudell's preliminary hearing testimony. He contended that the State had not exercised due diligence to find Rudell and secure his attendance. He also argued that he had not been able to cross-examine Rudell about his relationship with Delay's attorney. He sought an evidentiary hearing.

The district court first considered Cook's motion for an evidentiary hearing on the extent of the District Attorney's efforts to locate Rudell and secure his attendance at trial. The court remarked that the Antiterrorism and Effective Death Penalty Act, commonly known as the AEDPA, enacted heightened standards for obtaining an evidentiary hearing on a habeas claim, 28 U.S.C. § 2254(e)(2) (2000), but the new standards are not applicable when a habeas petitioner has been diligent in seeking to develop the factual basis for his claim and was prevented from doing so. Order of September 29, 2000 at 3, citing Williams v. Taylor, 529 U.S. 362 (2000). The court found that Cook made a reasonable effort to develop the factual record in the state court and was not to blame for any lack of factual record. Id. at 4. (Cook had, after all, asked for a hearing on the diligence issue, which the trial court denied.) Therefore, the court applied the pre-AEDPA standard for granting an evidentiary hearing. However, the district court found that Cook failed to show specific facts he wished to develop in

-7-

addition to those appearing in the state court record.  The court held Cook was not entitled to a hearing.  Id. at 4-5.

Because Cook filed this petition after April 24, 1996, the effective date of the AEDPA, the district court's consideration of Cook's substantive claims was governed by the AEDPA, under which the court could grant relief only if the underlying state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Order of March 27, 2001, slip op. at 5 (quoting 28 U.S.C. § 2254 (d)(1) and (2)).  The district court held that the Kansas courts' determination that the District Attorney had made a good faith effort to secure Rudell's attendance at trial was not contrary to or an unreasonable application of federal law.  Id. at 9.  Nor, according to the district court, was it unreasonable for the Kansas courts to conclude that Rudell's testimony could be admitted even though Cook did not get to cross-examine Rudell about his relationship with Delay's lawyer, Sewell.  The district court held that the need for such cross-examination was obviated by Cook's examination of the lawyer herself at trial and by counsel's arguments to the jury about the Rudell-Sewell relationship.  Id. at 10.  The district court denied

Cook's petition. Cook filed his notice of appeal, and the district court granted a certificate of appealability.

I.

The nature and extent of our review of Cook's conviction are dictated by the AEDPA. Under 28 U.S.C. § 2254(d) (2000), federal habeas review of state convictions is limited when the state courts have adjudicated a claim on the merits. As to such claims, the federal courts can grant a writ of habeas only if the state adjudication of the claim (1)"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding," § 2254(d)(2).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court interpreted the first section, § 2254(d)(1), which applies to errors of law and mixed questions of fact and law. Justice O'Connor's opinion for the Court stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412-13. "Unreasonableness" is gauged by an objective standard. Lockyer v. Andrade, 123 S. Ct. 1166, 1174 ( 2003). An "unreasonable application of federal law" denotes some greater degree of deviation from the proper application than a merely "incorrect or erroneous" application. Id. In Williams the Supreme Court declined to refine the meaning of the term "reasonable" as it is used in the AEDPA, other than to note that while it is "difficult to define," it is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." Valdez v. Ward, 219 F.3d 1222, 1230 (10th Cir. 2000) (quoting Williams, 529 U.S. at 410), cert. denied, 532 U.S. 979 (2001). More recently, the Supreme Court rejected the Ninth Circuit's attempt to refine the "unreasonable application" standard by equating it with "clear error." Andrade, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating clear error (even clear error) with unreasonableness.").

Under the AEDPA, the only federal law we are to consider is clearly established federal law as determined by decisions, not dicta, of the Supreme Court, as opposed to decisions of lower federal courts. Williams, 529 U.S. at 412. However, this does not mean that the Supreme Court must have decided the very case that a lower court has before it. Andrade, 123 S. Ct. at 1175. Instead, the AEDPA permits a grant of habeas where a state court has correctly identified

the governing rule from Supreme Court precedent but applies it unreasonably to the facts of the case before it. Williams, 529 U.S. at 407-08.

Cook claims that his conviction was obtained in violation of his Sixth Amendment right to confront the witnesses against him because the State was not diligent in securing Rudell's attendance at trial and because Rudell was not subject to cross-examination in his preliminary hearing testimony about his relationship with Cynthia Sewell, Gerald Delay's attorney. Both questions require application of the principles established in the United States Supreme Court case of Ohio v. Roberts, 448 U.S. 56, 66 (1980), which held that an exception to the Confrontation Clause permits admission of prior testimony in a criminal trial (1) if the witness is shown to be unavailable and (2) if his statement bears sufficient indicia of reliability.

When state courts have not adjudicated a petitioner's claim on the merits, the AEDPA standards do not apply; instead, we review questions of law de novo and questions of fact for clear error. Mitchell, 262 F.3d at 1045. In this case, the Kansas Supreme Court discussed whether Rudell was unavailable and whether the State had exercised due diligence to secure his attendance as issues of Kansas law, rather than discussing the federal Confrontation Clause precedents. Cook, 913 P.2d at 103-07. This presents the question of whether the unavailability aspect of Cook's Confrontation Clause claim was adjudicated on the merits.

Some of our cases have suggested that when a state court fails to discuss the federal law applicable to a claim, the state court has failed to consider the claim on its merits. See Woodward v. Williams, 263 F.3d 1135, 1140 (10th Cir. 2001) (applying non-AEDPA standard of review to Confrontation Clause argument because state court "did not explicitly consider the federal constitutional question before us"), cert. denied, 535 U.S. 973 (2002); Johnson v. Gibson, 254 F.3d 1155, 1165 (10th Cir.) (alternately considering claim as if adjudicated on merits by state court and as if not adjudicated on the merits because the state court failed to cite federal precedent), cert. denied, 534 U.S. 1036 (2001). On the other hand, in Aycox v. Lytle, 196 F.3d 1174, 1177 (10th Cir. 1999), we held that even where the state court had issued a summary order of dismissal which failed to discuss federal law governing a claim, the claim was adjudicated on the merits because "the decision was reached on substantive rather than procedural grounds." Accord Hawkins v. Mullin, 291 F.3d 658, 677 (10th Cir. 2002) (applying the AEDPA standard where state appellate court only discussed state law), cert. denied, 123 S. Ct. 1012 (2003); Sellman v. Kuhlman, 261 F.3d 303, 311-14 (2d Cir. 2001). There is no question but that the Kansas courts disposed of Cook's objections to Rudell's testimony on the merits, rather than on some procedural ground. Judge Brorby discussed the tension between these lines of cases in his dissent in Ellis v. Mullin, 312 F.3d 1201, 1209-10 (10th Cir. 2002). Whatever

-12-

discord exists between our decisions was resolved by Early v. Packer, 123 S. Ct. 362, 365 (2002) (per curiam), in which the Supreme Court said that failure to discuss or even to be aware of federal precedent does not in itself render a state court's decision contrary to federal law.  The Supreme Court thus applied the AEDPA standard to a claim which the State court disposed of without citing controlling Supreme Court precedent.   Id. at 366.  See Young v. McKune, No. 02-3098, 2002 WL 31768580, at *1 (10th Cir. Dec. 11, 2002) (following Early by applying the AEDPA standard to Confrontation Clause case decided by Kansas courts without reference to federal law).  We therefore must apply the AEDPA standard to determine whether it was an unreasonable application of the Supreme Court's Sixth Amendment jurisprudence to admit Rudell's preliminary hearing testimony at trial.

Subsidiary factual findings by the state courts are subject to a presumption of correctness, rebuttable only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Mitchell, 262 F.3d at 1045.

Cook does not dispute the Kansas courts' findings of historical fact, but only whether those facts support the legal conclusions that the State put forth a good-faith effort to produce Rudell and that his testimony bore sufficient indicia of reliability.  Those two issues are mixed questions of fact and law, Martinez v. Sullivan, 881 F.2d 921, 926 (10th Cir. 1989) (unavailability); Thomas v. Gunter,

962 F.2d 1477, 1483 (10th Cir. 1992) (reliability), subject to the AEDPA "unreasonable application of clearly established Federal law" standard.

Where, as here, the district court has not held an evidentiary hearing, but based its decision solely on review of the state court record, we conduct an independent review of the district court's decision. Smallwood v. Gibson, 191 F.3d 1257, 1264 n.1 (10th Cir. 1999), cert. denied, 531 U.S. 833 (2000).

## II.

Under Ohio v. Roberts, 448 U.S. 56, 74 (1980), and Barber v. Page, 390 U.S. 719, 724-25 (1968), it is clearly established that in order to prove that prior testimony falls within the unavailability exception to the Confrontation Clause, the government must show it made a good-faith effort to obtain the witness's attendance at trial. The Confrontation Clause expresses a preference for face-to-face confrontation. Ohio v. Roberts, 448 U.S. at 63. Ohio v. Roberts identified the components of a defendant's confrontation right as the interests in cross-examining the witness, in requiring the witness to testify under oath, in allowing the factfinder to view the witness's demeanor, and in requiring the witness to face the defendant as he tells his story. Id. at 63-64 & n.6. If the state is allowed to prove its case using a transcript of prior testimony, rather than live testimony, the defendant certainly loses the chance to have the factfinder view the witness's demeanor, and he may also lose the chance to make the witness face him as the

-14-

witness testifies.  Despite the loss of these important aspects of confrontation, where the government is able to prove the unavailability of a witness, the Sixth Amendment includes a "rule of necessity" permitting use of prior testimony.  Id. at 65.  But because there is a real cost to the defendant in foregoing true confrontation, the unavailability requirement must be more than a formality.

The complete history of the State's dealings with Rudell is relevant both to understand what the State should have expected from Rudell and to show the different methods available to the State for securing Rudell's attendance at trial.[1] By the time Leonard Smith testified at his inquisition, where he identified Rudell as a key witness, Rudell had fled Kansas.  Rudell later explained that he fled Kansas because he was afraid that Cook's family or other connections would kill him.  Rudell hitchhiked around Texas, Mexico, and Arizona, eventually landing in San Diego, California.  The District Attorney's office located Rudell in San Diego and brought him back to Topeka for an inquisition, which took place on June 3, 1993.  Cook contends that the District Attorney located Rudell in California by

---

[1]Our ability to evaluate the efforts the State made to secure Rudell's attendance at trial is somewhat hampered by the lack of a hearing on the subject.  Cook requested such a hearing in the state court, but the trial judge denied his motion.  Cook again asked for an evidentiary hearing on this subject in his habeas proceedings, but the district court denied it.  However, the State had the burden of proving it made a good-faith effort to find Rudell, so factual uncertainty on this score counts against the State.  See Valenzuela v. Griffin, 654 F.2d 707, 709-10 (10th Cir. 1981).

using information from the Social Security Administration.[2]   Rudell is disabled

and lives on social security disability insurance.  The District Attorney also

enlisted the services of local law enforcement in California to search for Rudell

through the use of the Uniform Act to Secure Attendance of Witnesses from

without State, Kan. Stat. Ann. § 22-4203.[3]  The District Attorney said at Rudell's

inquisition, "A warrant was sent out and he had to appear in California District

Court where he was ordered detained, at which time our Sheriff's Department

went–flew out and got him.  He was brought here as a material witness."[4]  She

---

[2]At the inquisition, the District Attorney alluded to the measures she had taken to locate Rudell and bring him back to Topeka.  She asked Rudell, "Did you know that we were trying to track you down through social security?"

[3]Kan. Stat. Ann. § 22-4203 allows a judge in Kansas to issue a certificate recommending that a witness found in another cooperating State be taken into custody there and delivered to an officer of Kansas to assure the witness's attendance in Kansas court.

[4]At Rudell's inquisition, the District Attorney engaged in the following colloquy with him:
> Q:  [L]et's also be truthful to the fact that you didn't come back to Kansas on your own.  We've been searching for you since the day I walked in, or a week or so after I took office.  If we hadn't had the help of Texas and California, I don't know if you would be back today. Would you?
> A:  That's a good question.  I can't answer that.
> Q:  I mean, they found you at that house and brought you in here because of a court order.  It wasn't like you called from San Diego and said, "I'm free. Come get me."  Right?
> A:  I–no–yeah, they picked me up and–took me in.

She added that Rudell came back "through a court order, and we've had to search for him."  In later proceedings, the District Attorney stated that she had secured Rudell's appearance at the inquisition by using the Uniform Act to Secure Attendance of Witnesses from Without State, Kan. Stat. Ann. §§ 22-4202 and 22-4203.

-16-

later said that the District Attorney in California "was lucky enough to find this witness through the material witness bond at a house, brought him before a District Court." Rudell was kept in jail in Topeka until after the inquisition.

After the inquisition, Wendell Betts, the attorney appointed to represent Rudell in connection with the material witness bond, moved to have Rudell released from jail. Betts informed the court that "Mr. Rudell has agreed to cooperate if they indeed decide to file cases against any other individual in this matter. Mr. Rudell has agreed to stay in contact with me on a weekly basis, that he would testify both at preliminary hearing of any individual and the trial of any individual." The court stated that, based on the information before it, Rudell had satisfied his obligation under the material witness bond and should be released. Both the District Attorney and Wendell Betts later stated that they considered Rudell released from the material witness bond.

Rudell returned to testify at Cook's preliminary hearing proceedings on October 13 and 14, 1993. After Rudell's preliminary hearing testimony, the District Attorney told the court that Rudell was "no longer under his material witness bond, but we would ask the court to order him back at the time setting that–." The court addressed Rudell: "Yes, sir, you may stand down and make yourself available for presence in court at the time this comes to trial if the defendant is bound over." Cook's attorney asked the court to require Rudell to

give his current address and telephone number to the District Attorney's office, but Rudell answered that he could be reached through his attorney, Mr. Betts. The District Attorney concurred that this was sufficient because Rudell "has kept us informed through his attorney, Wendell Betts, who has made him available every time that we have needed him." Rudell was not required to give an address and telephone number. When asked about this later, the District Attorney said that after the preliminary hearing, Rudell "was not forced to give his address. One reason, because he didn't want to, but because he had made himself available each and every time we wanted him to through his counsel, Wendell Betts." Betts had been appointed to represent Rudell for the material witness bond proceedings, which were terminated after the inquisition. Betts had no telephone number or address for Rudell, since he told the court he could only hope to contact Rudell by phoning the numbers from which Rudell had last called him.

After the preliminary hearing, Rudell was scheduled to testify at the joint trial of Elizabeth Hebert and Cook to begin on December 13, 1993. Before trial, Hebert pleaded guilty, and Cook's trial was continued to February 28, 1994. At the time of Hebert's plea, Rudell had already begun the trip to Kansas. Because there was no trial in December, the court did not approve paying Rudell's travel expenses. The District Attorney agreed to pay Rudell out of her budget, but there was some dispute between Rudell and the District Attorney's office about

reimbursing Rudell for his travel expenses. Rudell did not receive his money until he could prove from telephone records that he had been en route when he learned of the plea bargain. Mr. Betts said, "[H]e's been somewhat upset since that point."

The District Attorney had a subpoena issued, but admittedly never attempted to serve any process on Rudell for Cook's trial. On February 22, 1994, six days before Cook's trial, Rudell telephoned the District Attorney to say that he was out of money and could not come to Topeka unless he received expense money in advance. The District Attorney told him "it would be very difficult to get any money up front, that he did have a right to get mileage, et cetera, after he testified and swore to the fact of his travel here." Rudell hung up on her. The next day, Wednesday February 23, the District Attorney received a letter from Betts notifying her that unless Rudell received money in advance, he would not be at trial. She talked to Rudell on the phone that day and told him that she would try to get some money released and asked him to call her again on Friday to find out whether she had succeeded.

On Thursday, February 24, the District Attorney appeared before Judge William Carpenter to seek an advance of travel funds for Rudell. Cook was not notified of the hearing or represented there. At the hearing, Betts stated, "Judge, Mr. Rudell has made the State aware that he, ah, would not have funds over three

-19-

weeks ago. It's my understanding that in order for him to be here, he needed some travel pay in advance. . . . I think they have known this for some time, that he was not going to be able to come up with that money to travel."[5] Although both the District Attorney and Betts told the judge that Rudell was no longer subject to the material witness bond, Judge Carpenter pointed out, "The statutes have to be invoked before I can proceed under one of its provisions," apparently meaning that he had no authority to order money to be paid to Rudell under the Uniform Act unless Rudell were still subject to the original material witness bond issued for the inquisition. Judge Carpenter then held that "the mere fact that [another judge] released [Rudell] for good and sufficient reasons does not necessarily mean that he removed him from the jurisdiction of these statutes. Now, as long as we're under the jurisdiction of these statutes, I have the authority to order funds to be issued and tendered."

Even though the court released funds, Rudell never knew about them because he never called back. Both Betts and the District Attorney tried without success to reach Rudell at the telephone numbers from which he had earlier called them collect. Because neither Betts nor the District Attorney had an address or phone number for Rudell, their only plan for getting the money to him was to wire

_____

[5]The District Attorney disputed that she had known of the problem for three weeks. At trial, Cook's counsel indicated he had information that Rudell had called Nida Imhoff in the District Attorney's office three weeks before trial to ask about the money.

it to him by Western Union. No one was ever able to communicate with Rudell to tell him that the money had been sent. There is no evidence that the District Attorney took any further steps to retrieve Rudell.

On the first day of trial, February 28, 1993, the State informed the trial judge, Judge James Buchele, and Cook's counsel that Rudell might not appear at trial. The District Attorney sought a finding that Rudell was unavailable so that his preliminary hearing testimony could be used at trial. Defense counsel objected because the State had not taken adequate measures to keep track of Rudell's whereabouts and because defense counsel had never had a chance to cross-examine Rudell about his intimate relationship with Gerald Delay's lawyer. Judge Buchele found it was "ambiguous" whether Rudell was still subject to the Uniform Act, but found that the State's first notice that there might be a problem with Rudell getting to trial came "approximately five days ago," and that there was no way "a subpoena could have been served on him even if they had gone through the motions. You've got to know where he is to serve him." The next day, Judge Buchele suggested to the District Attorney that Rudell had breached his immunity agreement with her by failing to appear for trial and that she was therefore free to charge him for aiding a felon after the fact in the Duty murder. Judge Buchele stated: "It just seems to me that the–we want Mr. Rudell here and nobody is doing anything to get him here other than Western Union, and he hasn't

responded to that." The court added, "I suggest, if I were the District Attorney, I would get Mr. Rudell charged." But when Cook's counsel asked the court to reconsider its unavailability finding and to conduct an evidentiary hearing on what measures the State had taken to locate Rudell, the court denied the motion, saying, "Under the circumstances, the Court is satisfied the State's made a diligent effort. . . ."

B.

"'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.'" Martinez, 881 F.2d at 924 (quoting Roberts, 448 U.S. at 74). In Martinez, we refused to pronounce a per se rule defining the measures that the prosecution must take before a witness can be deemed "unavailable." Id. at 924, n.1 (rejecting dissent's proposal of per se rule requiring use of Uniform Act to Secure Attendance of Witnesses). Instead, we held that evaluation of reasonableness or good-faith effort "requires us to consider all the circumstances rather than to apply a per se rule." Id. But even without rigid rules, courts assessing reasonableness have identified four relevant criteria.

First, the more crucial the witness, the greater the effort required to secure his attendance. McCandless v. Vaughn, 172 F.3d 255, 266 (3d Cir. 1999); United States v. Quinn, 901 F.2d 522, 528 (6th Cir. 1990); United States v. Mann, 590 F.2d 361, 367 & n.6 (1st Cir. 1978) ("A lesser effort might be reasonable where

-22-

the testimony goes to minor, collateral, or uncontested matters."). <u>See generally</u> <u>United States v. Foster</u>, 986 F.2d 541, 543 (D.C. Cir. 1993) ("The more important the witness to the government's case, the more important the defendant's right, derived from the Confrontation Clause of the Sixth Amendment, to cross-examine the witness.")

Second, the more serious the crime for which the defendant is being tried, the greater the effort the government should put forth to produce the witness at trial. <u>McCandless</u>, 172 F.3d at 266 ("In a capital case, for example, it is fair to ask more of the prosecution than in a situation involving significantly less serious consequences.").

Third, where a witness has special reason to favor the prosecution, such as an immunity arrangement in exchange for cooperation, the defendant's interest in confronting the witness is stronger. <u>McCandless</u>, 172 F.3d at 266.

Fourth, a good measure of reasonableness is to require the State to make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available. The Third Circuit granted habeas on Confrontation Clause grounds when the evidence indicated that the State's inactivity resulted from complacency due to having the witness's preliminary hearing testimony:

> Given Barth's crucial role in the prosecution's case, we are left with
> the firm conviction that the prosecution's efforts to assure Barth's

presence would have been far less casual had the shoe been on the other foot. If the prosecution had not had Barth's preliminary hearing testimony and had needed Barth's presence at trial, we are confident that the resources and effort devoted to finding him prior to trial would have been greater than they in fact were. To countenance such a disparity would ill serve the interests protected by the Confrontation Clause.

McCandless, 172 F.3d at 269. Accord Mann, 590 F.2d at 367 ("The government did not make as vigorous an attempt to secure the presence of the witness as it would have made it if did not have the prior recorded testimony."); United States v. Lynch, 499 F.2d 1011, 1024 (D.C. Cir. 1974) ("It is difficult to believe that if the preliminary hearing testimony of this critical witness were not available, the prosecution would have abandoned its efforts at this point to locate Miss Brown and concluded its case.").

Here, Rudell's testimony was vital to the government's case. Only two people testified that they were present at Duty's killing: Rudell, who testified that Cook killed Duty, and Elizabeth Hebert, who testified that Smith did. The District Attorney herself characterized Rudell as "a key witness." Moreover, the crime at issue was very serious. Cook was convicted of first-degree murder and sentenced to life in prison without possibility of parole for forty years, although this sentence was vacated and Cook was resentenced to fifteen years to life. Rudell was granted immunity in exchange for his cooperation, thus heightening Cook's interest in confronting him. The importance of the witness, the

-24-

seriousness of the crime, and the witness's interest in inculpating the defendant all show that Cook's interest in confronting Rudell was high, and therefore the effort required from the government to produce Rudell at trial was great.

But the most telling factor is comparison of the State's efforts to secure Rudell's presence before he had given any testimony at all and the effort it made before trial. Before the inquisition, Rudell had been hitchhiking in Mexico and all over the Southwest, yet the State somehow managed to track him down. The State apparently used Social Security information to find Rudell. There is no indication in the record that Rudell was not still dependent on Social Security or that the State tried this method again when it found Rudell was unlikely to attend trial. Again, before the inquisition, the State used the Uniform Act, which gave it access to the resources of California law enforcement and courts to locate and secure Rudell. It did not do so before trial.[6] Before the inquisition, the State flew someone out to California to bring Rudell back to Topeka, where he was kept in jail until he had testified. Before trial, the State did not send him any ticket, let alone an escort to deliver him to the courthouse.

The State's explanation for its failure to take more positive steps to secure Rudell's attendance at trial was that Rudell's cooperation up until the week before trial justified the State's decision to rely on Rudell's "gentleman's agreement" to

---

[6]See discussion infra at 27.

return. The trial court and the Kansas Supreme Court accepted this explanation as the basis of their legal rulings, See Cook, 913 P.2d at 104, 107. However, the history of the State's dealings with Rudell show that the State was taking a big risk by relying on Rudell's voluntary appearance, with no contingency plan. Rudell had already run away from Topeka once because he feared for his life. He had to be brought back by force for the inquisition. The State failed to demand Rudell's address in part because he "didn't want to" give it, even though Cook's attorney protested at the preliminary hearing that the State did not have adequate control over Rudell. The Kansas Supreme Court stated that the reason Betts had no address for Rudell was that Rudell had a "nomadic lifestyle," 913 P.2d at 106, but the fact that the key witness moved around frequently would counsel more, not less, vigilance in keeping apprised of his whereabouts. The reasonableness of relying utterly on Rudell's voluntary undertaking to return has to be assessed in light of his earlier flight and his avowed fear of Cook and Cook's friends.

Moreover, the State knew that Rudell had little money. There had been a controversy getting him the money to reimburse him for his expenses in connection with the Elizabeth Hebert trial, and Rudell was disgruntled about it. Still, no one made sure his travel arrangements were in place.

Once the District Attorney learned on Tuesday, February 22 that Rudell was contemplating staying away from the trial, her complacency became even more

unreasonable. She herself told Rudell that she was unlikely to be able to fulfill the condition that he imposed–advance payment of his expenses. Other than obtaining the release of the travel money, which was simply placed in the care of Western Union, the District Attorney was apparently completely inactive over the course of the next week about assuring the presence of her key witness. She did not seek a continuance and she did not seek the witness. The State's failure to take positive steps to produce Rudell at trial makes a striking contrast with the heroic effort it made to track him down and haul him to Topeka before he had ever given evidence.

The perception of inadequate effort by the State is confirmed by comparing the facts of Cook's case with those of Martinez, a leading case in this circuit. There, we upheld a state court's conclusion that a witness was unavailable where, about a month before trial, the prosecution had served on a witness a New Mexico subpoena that was legally ineffective in Oklahoma, where the witness was located. 881 F.2d at 925. The witness had responded to this procedure for two previous trials in the same case. The subpoena was served by the witness's probation officer. The prosecutor also sent the witness a plane ticket to New Mexico and confirmed by telephone his intent to appear at the trial, as recently as the day before trial. Id. When he did not appear at trial, the prosecutor then used the Uniform Act to subpoena him and sent copies to the Oklahoma District Court

and Sheriff's office, but it made no other efforts to locate him. He was never located, and seven days after his failure to appear, the New Mexico state courts determined that he was unavailable. Id. We upheld their legal determination that the prosecutor had made a good-faith effort to locate the witness. Id. at 926.

There are fundamental differences between this case and Martinez. There, the State was in cooperation with the witness's Oklahoma probation officer, a person who was responsible for monitoring the witness's whereabouts and who was on the spot. 881 F.2d at 925. Here, all communication from the witness was at the witness's initiative because the State neither had an address or phone number, nor any local contact, and the State had acquiesced in the decision not to insist on any means of communicating with Rudell other than waiting for his telephone calls.

Second, in Martinez the State had served a subpoena on the witness, and there was no reason to think the witness believed it to be ineffective. Here, there was no attempt to have legal process served on Rudell for trial. The State argues that Judge Carpenter found Rudell was still subject to the material witness bond, but Cook was neither given notice of the hearing before Judge Carpenter, nor was he represented there. In the hearing before Judge Carpenter, both the District Attorney and Wendell Betts stated initially that Rudell had been released from the material witness bond, and Betts was quite adamant about it. Both lawyers

acquiesced in the suggestion that the bond was still in effect only after Judge Carpenter said that this was the only way to authorize the release of travel money to Rudell. Rudell was never made aware of any contention that he was still subject to the bond. At the trial, where Cook was represented, Judge Buchele said it was "ambiguous, to say the least" whether Rudell was still subject to the bond. The Kansas Supreme Court remarked, "The State does not argue that the defendant [sic–seems to mean Rudell] was subject to the material witness bond or any other type of process." 913 P.2d at 104. Therefore, any finding by Judge Carpenter at the ex parte hearing that Rudell was still subject to the bond was superseded by Judge Buchele's later assessment, and then the issue was abandoned before the Kansas Supreme Court.

Third, in Martinez the State had provided the witness with a plane ticket, whereas in this case, the last Rudell ever heard was that he had to pay his own way back to Kansas, there to be reimbursed. He was living on Social Security and had informed the District Attorney that he did not have the money to travel.

Fourth, when it became clear in Martinez that there was a problem with securing the witness, the State resorted to the Uniform Act, sending the proper requests to Oklahoma law enforcement and courts by overnight mail. 881 F.2d at 925. Martinez does not state whether there was a continuance, but at any rate, the unavailability hearing did not occur until seven days after the State initiated

proceedings under the Uniform Act. Id. Here, there was no such attempt to correct the earlier omission. Indeed, the trial court in this case strongly advised the District Attorney to charge Rudell with aiding and abetting and see to it that a warrant was issued for his arrest. She did not do so, apparently because immediately after giving this advice, the court held that the State had made a good-faith effort to secure Rudell's attendance.

Even in cases in which the State has actually attempted to track down witnesses, perfunctory attempts have been inadequate to establish good faith effort. For instance, in Quinn, 901 F.2d at 528, an officer had tried to serve the witness at her apartment, but found she had moved. He then heard she was staying with her mother; he saw her car there late at night, but when he tried to serve her the next day, she was gone. The Sixth Circuit held that these efforts were not enough to establish a reasonable effort to bring the witness to the trial:

> No testimony was offered that any county or city records were checked, that anyone tried to follow-up on the manager of the apartment building for a forwarding address, or that anyone tried to check with relatives prior to the trial. Further, it would appear that no one checked with any possible employers even though Braxton testified at the suppression hearing that she was employed. While we decline to attribute bad faith to the Government's effort, we are compelled to observe that it was singularly unenthusiastic.

901 F.2d at 528. See Mann, 590 F.2d at 367 ("This relatively high good faith standard cannot be satisfied by perfunctory efforts. . . ."). In Valenzuela v.

-30-

Griffin, 654 F.2d 707, 710 (10th Cir. 1981), we held that the State had not established a good faith effort to produce a witness: "A simple statement by the prosecutor that the state had issued a subpoena and bench warrant and 'had been looking for her' is not enough." Cf. United States v. Eufracio-Torres, 890 F.2d 266, 270 (10th Cir. 1989) (in transporting illegal alien case, state's effort reasonable where process served, witness instructed to return, and witness promised to do so). Likewise, in this case, where there was no evidence that the State searched for Rudell and the State issued no warrant for his arrest, its efforts simply cannot be characterized as reasonable.

We are acutely conscious of the deference we must accord to state courts' application of federal law, here, the reasonableness test for unavailability laid down in Ohio v. Roberts. Demanding as the AEDPA "unreasonable application" standard is, the Supreme Court and this court have sometimes held relief to be warranted under that standard. See Penry v. Johnson, 532 U.S. 782, 803-04 (2001) (Texas court's conclusion that jury instructions complied with Supreme Court mandate objectively unreasonable); Williams v. Taylor, 529 U.S. 362, 397 (2000) (state court decision contrary to and unreasonable application of federal precedent); Johnson v. Gibson, 254 F.3d 1155, 1165-66 (10th Cir.) (state court's application of federal harmless error standard unreasonable), cert. denied, 534 U.S. 1036 (2001); Battenfield v. Gibson, 236 F.3d 1215, 1233-35 (10th Cir. 2001)

(state court's application of Strickland[7] standard unreasonable); accord Lewis v. Wilkinson, 307 F.3d 413, 422 (6th Cir. 2002) (granting relief under AEDPA for unreasonable application of Confrontation Clause precedent); see also Herrera v. Lemaster, 225 F.3d 1176, 1178 (10th Cir. 2000) (state court failure to identify correct rule resulted in decision contrary to federal law), on rehearing en banc, 301 F.3d 1192 (10th Cir. 2002), cert. denied, No. 02-7792, 2003 WL 397814 (U.S. Feb. 24, 2003).

We are convinced that the Kansas courts' holding that the State made a good-faith effort to produce Rudell at trial was simply unreasonable. Cook was on trial for first degree murder. Rudell was the key witness, whose testimony was necessary for conviction. Rudell had received immunity in exchange for his cooperation in the case. He had run away once and had to be tracked down and brought back in police custody for the inquisition. By opposing Cook's request after the preliminary hearing to get Rudell's address, the State put itself entirely at the mercy of Rudell's whim regarding whether or not to return for trial. See United States v. Rothbart, 653 F.2d 462, 466 (10th Cir. 1981) (no good-faith effort to secure witness's attendance where State cleared the way for witness to leave jurisdiction). Then the State failed to work out travel arrangements in advance when it knew Rudell was indigent, thus making it downright likely that

---

[7]Strickland v. Washington, 466 U.S. 668 (1984).

-32-

something would go wrong. After communications from Rudell showed he was thinking of staying away, the State made no effort to locate him, though the State had succeeded in locating him before by use of government agencies. Locating him should have been easier this time, since Betts had the telephone numbers Rudell had called from recently. The State ignored Judge Buchele's advice to issue a warrant for Rudell's arrest because Rudell had broken his immunity agreement with the State. The State did not seek a continuance to allow it to locate Rudell. If the State's feeble exertions in this case can be called a good-faith effort to secure Rudell for trial, the Sixth Amendment protections embodied in Ohio v. Roberts would be toothless.

We therefore conclude that Cook's conviction was obtained in violation of his Sixth Amendment rights and that the Kansas courts' decision to the contrary was an unreasonable application of established federal law as determined by the Supreme Court of the United States.[8]

### III.

Cook further contends that he is entitled to relief under the second requirement from Ohio v. Roberts, 448 U.S. 56, 66 (1980), that the hearsay bear adequate indicia of reliability. Ohio v. Roberts makes clear that the adequate indicia of reliability requirement "operates once a witness is shown to be

---

[8]Accordingly, it is unnecessary to order an evidentiary hearing on the diligence issue.

unavailable." Id. at 65.  Having decided that the State did not show Rudell was unavailable, we need not reach the reliability issue.  If Cook is retried, the reliability issue must be assessed on the record from the second trial, not the record before us, and so our comments would be advisory at best.

The State has not argued that the failure to make a reasonable effort to locate Rudell and produce him for trial was harmless error.[9]  Therefore, we reverse and remand with directions to grant the writ, conditioned upon the retrial of Cook by the State of Kansas.

---

[9]We do not consider this to be an appropriate case for us to conduct harmless error review unassisted by briefing by the parties or consideration by the district court.  See United States v. Samaniego, 187 F.3d 1222, 1224-25 (10th Cir. 1999) (on direct review, court declined to exercise its discretion to conduct harmless error review where government did not raise issue); United States v. Torrez-Ortega, 184 F.3d 1128, 1136-37 (10th Cir. 1999) (same); 2 Randy Hertz and James S. Liebman, Federal Habeas Corpus Practice and Procedure § 31.2a (4th ed. 2001) ("Like other defenses to habeas corpus relief, the 'harmless error' obstacle does not arise unless the state asserts it; the state's failure to do so in a timely and unequivocal fashion waives the defense.").