**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 31, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KERRY MALONE,

        Petitioner - Appellant,

    v.

STEPHEN SIX, Attorney General of
Kansas,

        Respondent - Appellee.

No. 07-3268

(D. Kansas)

(D.C. No. 06-CV-03073-JAR)

**ORDER AND JUDGMENT**[*]

Before **HARTZ, HOLLOWAY,** and **ANDERSON**, Circuit Judges.

Petitioner and appellant Kerry Malone appeals the denial of his 28 U.S.C.

§ 2254 petition for relief following his conviction for aggravated arson.[1] The

district court denied Malone a certificate of appealability. On May 13, 2008, our

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[1]Malone has been released from the Lansing Correctional Facility and, as of
July 16, 2008, has completely discharged his sentence in this case. As a result,
Warden McKune no longer has responsibility for Malone and this court lacks
personal jurisdiction over the warden. Malone filed a request to amend the
parties, which we construed as a motion to dismiss McKune as a party. We have
accordingly removed Warden McKune as a named party in this case, and the case
proceeds solely against Mr. Stephen Six, the Attorney General of Kansas.

court issued an order granting a certificate of appealability on the issue of whether Malone's confrontation clause rights as guaranteed by the Sixth Amendment were violated by the introduction into evidence of a statement by a material witness not present at trial, and whether, if so, this was harmless. For the reasons stated below, we conclude that there was no Sixth Amendment violation and, therefore, affirm the denial of habeas relief.

## BACKGROUND

Malone was in a relationship with and had a daughter with a woman named Glenda Sams. Malone and Sams had separated at some time prior to August 1, 2001. Sams resided in Apartment D of the Wycliff West apartments in Overland Park, Kansas. According to Sams, she received a phone call from Malone in the early hours of August 1, 2001, during which Malone indicated a desire to reunite with her. She testified[2] that she told him she did not love him anymore and hung up on him. Tr. of Prelim. Hr'g at 23-24. Later that night, sometime between 3:00 a.m. and 4:00 a.m., Sams was awakened by a loud noise. She claimed that she looked briefly out her balcony window, then went back to bed. Instead of calling the police, she waited until 8:00 a.m. to contact the apartment manager. The apartment manager directed Sams to call the police. Investigation revealed

---

[2]As will be more fully explored, *infra*, Sams testified at the preliminary hearing in this case, but not at the trial. Thus, the testimony referred to is Sams' preliminary hearing testimony.

damage to the balcony and adjacent areas, apparently caused by an explosion of some kind.

Overland Park police officer Michele Bregel was dispatched to Apartment D, arriving at approximately 9:15 a.m. Sams told the officer about the loud noise. Officer Bregel testified that, when she asked Sams "who she believed could have caused the damage . . . on her balcony and apartment," Sams replied, "it was Kerry Malone." Tr. of Jury Trial at 61-62. While Officer Bregel was in the apartment "standing right next to" Sams, id. at 66, Malone telephoned Sams, who answered the phone and told Malone that the police and officers from the Bureau of Alcohol, Tobacco and Firearms were at her apartment. Malone hung up. The phone rang again, Sams answered the phone, and handed the phone to Detective John Sanders, another law enforcement officer in the apartment. The caller then hung up. When questioned about the damage to her balcony and the status of a pet iguana Sams had, she testified that the explosion had killed the iguana. Officer Bregel testified that she saw a live iguana in a terrarium in Sams' bedroom. On cross-examination about the phone calls, Officer Bregel answered that Sams had said that Malone asked whether Sams was "okay." Id. at 74.

Officer Bregel also spoke with apartment complex employee Jenny Hintz, who received a phone call at about 4:00 a.m. from a tenant, Tony Page, concerning a possible explosion. Page testified at trial that he was retired from the military after serving for fifteen years. He further testified that his military

-3-

experience had given him some familiarity with artillery explosions. Page stated that he, along with his family, had pulled into the parking lot of the Wycliff West apartment complex at about 4:15 a.m. on August 1, 2001. While he was getting out of his car, he heard a loud explosion. Upon hearing the explosion, Page apparently saw two people run out from behind the carport, get into a car, and drive away. He stated that five to ten seconds elapsed from the time of the explosion to his observation of two males running to a car. Page's wife called 911 from her cell phone. Page indicated that the two men were Caucasian males who appeared to be in their 20's. Page wrote down the license plate number on the car, a dark brown or maroon 1980's Buick or Oldsmobile. As it turned out, the license number Page saw matched the number on Malone's car.

After Page and his family went into their apartment, Page went back outside to the area behind the carport and looked to see if anything seemed amiss. He indicated he did not find anything out of the ordinary, but did detect the smell of gun powder in an area within 250 feet of Sams' apartment.

Officer John Friedrich also testified that he was dispatched to Sams' apartment on August 1, 2001. When he arrived at Sams' apartment, he observed that the screen door on the sliding door to the balcony was damaged. He further stated that it smelled like fireworks in the apartment. Officer Friedrich observed some damage to the wall on the outside and the inside of the apartment.

Patricia Benjamin, the property manager for the Wycliff West apartments, testified that she was responsible for the maintenance and upkeep of the apartment complex. She inspected the balcony of Sams' apartment, and observed visible damage to the balcony, the area around the door, and the wall to the east of the patio door. Benjamin observed damage to the inside of the apartment as well. In her opinion, an explosion had occurred on the outside of the apartment on the balcony. Benjamin also testified that Sams said that Malone was behind the explosion. Id. at 115. Malone objected on hearsay grounds, but the court allowed the testimony in under the "res gestae" exception, noting that Benjamin was "the first person on the scene" and "was called by Ms. Sams." Id.

Officer James Dawkins, an evidence technician and a member of the bomb squad, was also dispatched to Sams' apartment on August 1. He testified he smelled a strong odor of burnt powder like black powder. He saw damage to the wall both inside and outside the apartment. Based on the physical evidence, including some green fiber which he assumed was a fuse, Dawkins testified that he thought some kind of large black powder device or tube that was lit by a time fuse had caused the blast.

Malone was subsequently arrested and charged with aggravated arson. The preliminary hearing took place on September 18, 2001. Prior to the preliminary hearing, Sams was subpoenaed by an officer slipping the subpoena underneath her

-5-

apartment door. She accordingly appeared at the preliminary hearing and testified as to the events in the early morning hours of August 1, 2001.

Trial was set for December 17, 2001. Investigator Matthew Blackwell was assigned the task of serving Sams with a subpoena for trial. Blackwell first attempted to serve Sams on December 15. He "tried the original address where the offense was committed twice" and then "learned from her father that she had moved." Tr. of Mot. to Determine Unavailability of Witness at 4-5. Sams' father indicated he did not know Sams' exact new address. Blackwell left his pager and office numbers with Sams' father. Blackwell testified he (Blackwell) made no effort to find Sams' phone number or determine precisely her new address.

When it became apparent that Sams was not present for the December 17 trial date, the prosecution requested that the court find Sams unavailable or grant a continuance. Over defense counsel's objection, the trial court granted a continuance and rescheduled the trial for February 25, 2002.

On December 19, 2001, Detective Jim Sanders was given the duty of subpoenaing Sams for the newly rescheduled trial. The next day, December 20, he obtained Sams' new address and visited the apartment manager of her new apartment. The manager "verified that Ms. Sams did, in fact, live there and was paying rent." Id. at 10. Sanders knocked on the door of Sams' apartment, but received no response. He recognized a door hanging and floor mat that had been

at Sams' previous address. He also noted that the mailbox had the names "Malone/Sams" on it.

On December 22, Sanders went to Sams' father's house and spoke with Sams' stepmother. She was unable to provide any information about Sams. Sanders returned to Sams' current address on December 24, knocked on the door, and called a telephone number he had been given for Sams. No one answered the door and Sanders could hear the phone ringing inside, with no answer. On January 2, 3 and 4, Sanders returned to Sams' apartment, knocked on the door and called her telephone, with no response. Sanders testified that he was "going at different times of the day when [he] was making these trips." Id. at 14.

Upon receiving no response at the door or on the phone on January 4, Sanders went to Sams' sister's house. Sams' sister, Becky, indicated that "she also had been trying to locate and trying to contact [Sams] and ha[d] not been successful." Id. at 15. Becky further stated that "Sams gets depressed and will hide in her apartment and not answer the phone or not answer the door." Id. Sanders obtained from Becky the phone number of Sams' brother, Jerry, whom Sanders then contacted and who said he had also been trying to reach Sams but was unsuccessful. Jerry also told Sanders that "Malone had bonded out of jail and that he felt that Mr. Malone was living back with Ms. Sams again and that's why she wouldn't answer the door." Id. at 17.

Sanders again attempted contact on January 7 and 10. On at least one of these occasions, Sanders' placed the door mat in such a way that he could determine if anyone subsequently entered or left the apartment, and, when he returned, he was able to determine that someone had indeed entered or left the apartment. Sanders returned once again on February 8, and again received no answer when he knocked on the door and called Sams' phone number. That was the last time Sanders attempted to serve a subpoena on Sams.

On February 15, 2002, the prosecution filed a motion to determine Sams' unavailability as a witness. On February 22, the Friday before the Monday trial, the prosecution filed an affidavit claiming that it believed Sams was avoiding service, and that she was a material and essential witness. The trial court deferred ruling on the motion to determine Sams' unavailability until Monday, the day of trial. The court also observed that a material witness bond was appropriate in these circumstances. Accordingly, a material witness bond for Sams was issued and Sanders was dispatched to enforce the warrant. Sanders once again went to Sams' apartment, knocked on the door and called her phone from the doorstep. He received no response. He spoke to a neighbor, who claimed to have seen Sams some three weeks prior, and he attempted to contact Becky and Jerry. Becky's phone number had been disconnected and Jerry never returned his call. No further attempts were made to contact Sams before the trial commenced on February 25, 2002, and the material witness bond was never executed.

On February 25, the morning of trial, the prosecution argued "that a finding

of unavailability for the witness [Sams] is readily apparent."  Tr. of Jury Trial at 7.

The trial court ultimately ruled as follows:

> [T]he statute speaks clearly of "unavailability."  I think what we have
> here is that we know where she's at but she won't come to the door,
> or police ha[ve] been unable to serve her with the subpoena at that
> address, knowing where she's at.
>     Her sister and brother are now apparently not cooperative.  Her
> father was never very cooperative in the case, the general indication
> is.  It's similar to what process servers find on a regular basis of
> trying to serve papers on people.  People won't come to the court.
> People will try to avoid service of process.  I don't think that's the
> same as "unavailability" under the statute. . . .  I don't think she's
> "unavailable."  I think the necessary effort would have been to sit at
> her apartment, do whatever to get her to a point where you could
> serve that subpoena on her and require her to come to court—or the
> warrant.  That was not done.
>     Detective Sanders detailed his visits and, generally, briefly he
> would sit out in the car and wait, but with no concerted, long efforts
> to find the witness.  Unfortunately, I don't think that meets the statute
> requirements, so I'm not going to find she's "unavailable."  So the
> motion to determine she's unavailable is denied.

Id. at 31-32.  The prosecution then presented the court with the case, State v. Ford,

502 P.2d 786 (Kan. 1972), in which a witness was declared unavailable when the

witness was avoiding being served.  In reliance on Ford, the trial court "reverse[d]

its earlier ruling, [and] . . . f[ou]nd that the witness is unavailable" so that Sams'

preliminary hearing testimony would be admitted.  Tr. of Jury Trial at 42.  Sams'

preliminary hearing testimony was accordingly presented to the jury.  In closing

arguments, the prosecution referred to Sams' preliminary hearing testimony as

-9-

probative that Malone was in fact the perpetrator of the explosion. As indicated, the jury convicted Malone of aggravated arson.

Malone filed a motion for a new trial on May 1, 2002. At the hearing on that motion, Sams appeared and responded to why she was not present for the trial on February 25, 2002. She said she had never received a subpoena, and therefore did not know that she was required to appear at the trial. She specifically stated that she was not "trying to avoid the police or service to come to trial." Tr. of Sentencing/Mot. for New Trial at 5. When asked how she knew to appear at the motion for a new trial, Sams responded, "Subpoena . . . was taped to my door and it was underneath my door. I have two copies." Id. She further stated, "I knew about the preliminary hearing, and I knew that because I got the subpoena underneath my door. It's the only way I know." Id. at 7.[3]

Based on Sams' testimony, and her appearance at both the preliminary hearing and the motion for a new trial, Malone asked the court to reverse its finding that Sams was unavailable and grant him a new trial. The trial court overruled the defense motion, and proceeded to set a sentencing date.

Sentencing took place on May 30, 2002. Sams appeared at the sentencing proceeding, and testified that Malone was not a violent person, that he was needed

---

[3]Pursuant to Kansas law, it is a permissible form of service to leave a subpoena at the residence of the person to be served and mail a notice to that person, indicating that a copy has been left at the residence. See Kan. Stat. Ann. 60-303(d).

by their young daughter, and that he had never caused any trouble for her or their daughter since the balcony explosion incident. Defense counsel requested a dispositional and durational downward departure from the sentencing guidelines, which was granted. Malone was sentenced to forty-four months' imprisonment.

The Kansas Court of Appeals ("KCOA") affirmed Malone's conviction and sentence. State v. Malone, 95 P.3d 1042 (Table), No. 89439, 2004 WL 1878290 (Kan. Ct. App. 2004). The KCOA held:

> Without deciding the district court erred in the admission of the challenged testimony, even a constitutional error may be harmless if the appellate court is willing to declare beyond a reasonable doubt that the claimed error had little, if any likelihood of changing the result of the trial. Based upon the record before this court we so declare the claimed error here had little, if any, likelihood of changing the result of the trial and the district court did not abuse its discretion when admitting the challenged testimony.

Id. (citation omitted). The Kansas Supreme Court declined review.

In Malone's federal habeas petition, the federal district court determined that the issue presented in Malone's habeas petition was a mixed question of law and fact, and therefore not subject to AEDPA deference. Applying a *de novo* standard of review, the district court concluded that Malone had failed "to show that he was denied the right to confrontation under the Sixth Amendment." Mem. & Order at *2. The court therefore determined it need not "proceed to review the Kansas Court of Appeals' conclusion that any constitutional error was harmless." Id. at *5. This appeal from the denial of Malone's habeas petition followed.

-11-

**DISCUSSION**

The KCOA determined that any constitutional error in this case was harmless beyond a reasonable doubt. That ruling implied that the admission of Sams' confronted pretrial testimony was constitutional error. But the KCOA expressly declined to decide the question, stating:

> Without deciding the district court erred in the admission of the challenged testimony, even a constitutional error may be harmless if the appellate court is willing to declare beyond a reasonable doubt that the claimed error had little, if any likelihood of changing the result of the trial.

State v. Kansas, 95 P.3d 1042 (Kan. Ct. App. 2004)(unpublished)(citation omitted)(emphasis added).

> Normally we would --
>
> assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht [v. Abrahamson]*, 507 U.S. 619 [1993], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman [v. California]*, 3286 U.S. 18 [1967].

Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007).[4]

---

[4]If the KCOA had determined that there was no constitutional error, *i.e.*, that the trial court properly ruled that Sams was unavailable within the meaning of Crawford v. Washington, 541 U.S. 36, 59 (2004), we would be reviewing this case under standards set out in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), to determine if the KCOA's application of Crawford was unreasonable or that it was based on an unreasonable determination of the facts. 28 U.S.C. § 2254 (d)(1) and (2). But, the Court has made it clear that

> [I]t is implausible that, without saying so, AEDPA replaced the

(continued...)

-12-

However, if the question of harmlessness is present here, "so too [is] the question of whether there was constitutional error in the first place. After all, it would not 'matter which harmless error standard is employed' if there were no underlying constitutional error," Fry, 127 S. Ct. at 2327-28.

Accordingly, looking past the ruling of the KCOA, we, as did the district court, proceed to examine *de novo* whether the admission at trial of Sams' confronted pretrial testimony violated Malone's Sixth Amendment confrontation right. In doing so, we do not defer to the district court's findings of fact because it relied solely on the state court record. Wilson v. Sirmons, 536 F.3d 1064, 1073 (10th Cir. 2008). Rather, we review the state court record *de novo*. Id. at 1074.

At the time of Malone's trial, Crawford v. Washington, 541 U.S. 36 (2004), had not been decided; but the opinion, issued in March 2004, was published more than five months before the KCOA issued its opinion in this case. And, Crawford explicated, rather than changed, the Sixth Amendment principles applicable here:

---

[4](...continued)
*Brecht* standard of "'actual prejudice,'" 507 U.S., at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)), with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable. That said, it makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former.

Fry, 127 S. Ct. at 2327.

> Where testimonial evidence is at issue, however, the Sixth
> Amendment demands what the common law required: unavailability
> and a prior opportunity for cross-examination.

Id. at 68.

The parties agree that the only constitutionally significant question before us is whether the state adequately proved Sams' unavailability at trial and, thus, whether the state trial judge erred in making a finding of unavailability and admitting Sams' confronted pretrial testimony.

We have not yet examined the meaning of unavailability under Crawford, but our prior cases have held that the issue of unavailability of a witness is a mixed question of fact and law that we determine *de novo*, and its resolution turns on the reasonableness and good faith of the state's effort to obtain the witness's attendance at trial. See Martinez v. Sullivan, 881 F.2d 921, 926 (10th Cir. 1989).

Four criteria are used to assess reasonableness. Cook v. McKune, 323 F.3d 825, 835 (10th Cir. 2003). First, the court must consider the importance of the witness; the more crucial her testimony, the greater the effort required of the state to secure her presence at trial. Id. Second, the more serious the crime charged, the greater the effort required of the state. Id. Third, if a witness has a reason to favor the prosecution, like an immunity agreement, the accused's need for confrontation is greater. Id. at 836. Finally, as a general measure of reasonableness, courts can look to whether the state made as great an effort to obtain the witness's presence as it would have if there had been no prior testimony

to substitute for live testimony.  Id.  Only the fourth criterion is at issue here:

Both sides agree that (1) Sams was a very important witness, (2) the charge faced

by  Malone was serious,[5]  and (3) the third criterion is inapplicable.  The inquiry,

then, focuses on the state's efforts to secure Sams' presence at trial.

However, the prospective witness's own actions may also be weighed as part

of the inquiry.  Thus, a witness may be unavailable when the witness is evasive

with law enforcement.  See Ewing v. Winans, 749 F.2d 607, 611–12 (10th Cir.

1984) (holding that the record supported the finding that the witness was

unavailable when the witness refused to provide the prosecutor contact

information for her trial appearance, the witness gave the process server an

address to a vacated apartment, leaving the process server with no additional leads,

and a police attempt to arrest the witness failed); see also State v. Ford, 502 P.2d

786, 788–91 (Kan. 1972) (affirming under Kansas law the admission of the

testimony of a witness not present at trial when the witness evaded service).

---

[5]The district judge discounted the severity of the charge, saying that while it is "serious," the "consequences of a conviction are not 'grave,' as they would be in a capital case," nor "was petitioner charged with an offense that carried a life sentence."  We respectfully disagree with the district judge's evaluation of this factor.  The charge to which Malone was found guilty—aggravated arson that results in a substantial risk of bodily harm—is a "severity level 3" felony on a scale of one to ten, with ten being the least serious type of crime.  Kan. Stat. Ann. §§ 21-3719(b)(1),-4707(a).  Further, although Malone received only 44 months, he was 33 years old when he was convicted, and under aggravating circumstances it is possible for a defendant to receive more than 40 years in prison for this crime.  See Kan. Stat. Ann. §§ 21-3719, -4704, -4719(b)(2); KAN. SENTENCING GUIDELINES REFERENCE MANUAL app. G (2007).  The state has conceded that this factor weighs in favor of Malone.

The facts regarding the state's repeated efforts to serve a trial subpoena upon Sams have been set out in detail above, and are not in dispute. They show tenaciousness and commitment. A state investigator twice tried to serve Ms. Sams at the apartment where the offense was committed before learning she had moved. Then, a police detective tried Ms. Sams' new address. When she did not answer her door, the detective went to Ms. Sams' father's house and spoke with her stepmother. The detective then returned to Ms. Sams' current home, this time calling her number while he was there. Unsuccessful, the detective returned three more times on three different days at three different times, both knocking on the door and calling her number, but to no avail.

Still undeterred, the detective went to speak with Ms. Sams' sister, and discovered that Ms. Sams "gets depressed and will hide in her apartment and not answer the phone or not answer the door." The detective then contacted Ms. Sams' brother, who told the detective that "he felt that Mr. Malone was living back with Ms. Sams again and that's why she wouldn't answer the door." The detective then returned to Ms. Sams' apartment three more times, still with no success.

A material witness bond was issued, and the detective was dispatched to enforce the warrant. The detective once again knocked on Ms. Sams' door and called her phone, with no success. The detective then tried to contact Ms. Sams' siblings, but he was unsuccessful.

-16-

To sum up, although sliding the subpoena under the door may have been wise because it had worked previously to bring Sams to the preliminary hearing, there is no indication that the state would have tried this or other methods of valid service if they had not already had her preliminary hearing testimony. Rather, given the knowledge (through Sams' brother) that Malone may have been living with her, it is less likely that the state would have tried that method again even if it lacked Sams' preliminary hearing testimony because of the possibility that Malone would intercept the subpoena.

The efforts made to obtain Sams' presence at trial, as demonstrated by the numerous attempts to personally serve her and the surrounding investigation of how to reach her, were substantial. Further, Sams' apparent unwillingness to answer the door or her phone weighs in favor of finding the state's efforts to be reasonable. See Ewing, 749 F.2d at 611–12; see also Ford, 502 P.2d at 788–91.

Although this is a close case, we conclude that the state's efforts pass Sixth Amendment muster, and the rulings by the state trial judge and the federal district judge that Sams was unavailable were not error.

## CONCLUSION

Accordingly, the judgment of the district court dismissing the petition for a writ of habeas corpus is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge