**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 15, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

GABRIEL ALEXANDER ACOSTA,

     Petitioner - Appellant,

v.

No. 17-1131

RICK RAEMISCH, Executive Director,
Colorado Department of Corrections;
CYNTHIA COFFMAN, Attorney General,
State of Colorado,

     Respondents - Appellees.
_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CV-02266-RPM)**
_____

Anthony J. Shaheen (Christopher A. Chrisman and Jessica M. Schmidt with him on the
briefs), Holland & Hart LLP, Denver, Colorado, for Petitioner – Appellant.

Ryan A. Crane, Senior Assistant Attorney General, Criminal Appeals Section
(Cynthia H. Coffman, Attorney General, with him on the brief), Denver, Colorado, for
Respondents – Appellees.
_____

Before **KELLY**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

Petitioner-Appellant Gabriel Acosta and his girlfriend, Chante Dillon, killed their roommate, Kimberly Dotson, after Ms. Dotson wrecked their car. Mr. Acosta and Ms. Dillon duct-taped, beat, and suffocated Ms. Dotson to death, then bagged her body in trash bags and threw her in a dumpster. They were both charged with first-degree murder.

Patricia Medina was the only eyewitness to the murder. Before Mr. Acosta's trial, Ms. Medina described the killing in a recorded statement to the police, in two criminal depositions at which she was cross-examined, and at Ms. Dillon's trial, where she was again subjected to cross-examination. But Ms. Medina was deemed unavailable to testify at Mr. Acosta's trial, so the transcripts of her testimony were read to the jury.

Mr. Acosta was convicted in Adams County, Colorado of first-degree murder and sentenced to life without parole. The Colorado Court of Appeals (CCA) affirmed his conviction. Mr. Acosta then sought habeas relief in federal court under 28 U.S.C. § 2254. He claims he was denied his right to confront witnesses against him and to the assistance of counsel, both in violation of the Sixth Amendment. The district court denied relief. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm.

## I.     BACKGROUND

To place our analysis in context, we begin with a summary of (A) the pretrial proceedings, (B) the state-court trial, (C) Mr. Acosta's direct appeal, and (D) the district court's ruling on Mr. Acosta's petition.

2

## A. *Pretrial Proceedings*

An information filed on April 23, 2004, in Adams County, Colorado, charged Mr. Acosta with first-degree murder for the slaying of Ms. Dotson. On April 28, 2004, Christopher Decker, an attorney with the Adams County Division of the State Public Defender's Office, appeared as counsel for Mr. Acosta.

As trial neared, Ms. Medina failed to appear in response to subpoenas for two hearings. So, she was jailed. And pursuant to Colorado Rule of Criminal Procedure 15, the trial court ordered the taking of Ms. Medina's deposition to preserve her testimony for use at Mr. Acosta's and Ms. Dillon's trials in the event she failed to appear again. The court recognized that while taking a deposition in a criminal case is an extraordinary remedy, this is "a situation in which a witness has indicated her unwillingness to appear at trial."

At Ms. Medina's deposition on December 15, 2004, she was cross-examined by Ms. Dillon's counsel, and when she was again deposed on December 22, 2004, she was cross-examined by Mr. Acosta's counsel. Ms. Medina's testimony provides the horrific details of how Mr. Acosta and Ms. Dillon hog-tied Ms. Dotson's hands and legs together and covered her mouth with duct tape; how they punched and kicked her to death; how they wrapped her body in trash bags; and how they discarded her body in a dumpster.

After the depositions were completed, Ms. Medina's attorney moved for her release. The court granted the request on the condition that Ms. Medina post a $2,500 personal recognizance bond and report to supervised release. Ms. Medina failed to

report to supervised release, so a warrant for her arrest was issued on January 20, 2005. She was later arrested and kept in custody until she testified at Ms. Dillon's trial in March 2005. Ms. Dillon was convicted of manslaughter.

Mr. Acosta's trial was scheduled to begin on Monday, April 4, 2005. At a hearing held on March 31, 2005, Mr. Decker advised the trial court that a non-waivable conflict requiring his withdrawal had arisen. The trial court accepted counsel's statement that he could not ethically disclose the conflict and thus granted his motion to withdraw as Mr. Acosta's counsel.

The court then engaged in a colloquy with Mr. Acosta during which it gave him the choice of proceeding without counsel or of waiving his right to speedy trial to allow newly appointed counsel to prepare for trial—which the court concluded could not be done in the four days remaining before the scheduled trial date. Mr. Acosta waived speedy trial so he could be appointed new counsel, and his trial was rescheduled to begin on August 29, 2005.

On April 6, 2005, Ms. Medina's counsel asked the trial court to release Ms. Medina because Mr. Acosta's trial had been rescheduled. The court stated: "As I have indicated before, I am not going to keep Ms. Medina in jail forever on this case. But at the same time, Ms. Medina, you know, every time I release you, you disappear on us. Ms. Medina, what are we going to do about this?"[1] In response, Ms. Medina's counsel stated that if Ms. Medina does not report, then the court "can put her back in

_____

[1] The court had stated at the prior hearing that it would not hold Medina in jail "indefinitely."

4

jail." The court agreed that it would. It then asked whether Ms. Medina had a place to live in the meantime. Ms. Medina said she could stay with her brother. Satisfied with her response, the court released Ms. Medina on a $500 recognizance bond, ordered her to report for supervised release the next day, and stated that this would be "a test on both you and me to find out whether you're going to honor what I have to say." The court then assured Ms. Medina that the district attorney would provide her with transportation to the court to ensure her attendance at trial. Mr. Acosta was not present at the April 6th hearing. Nor was a lawyer present on his behalf. New counsel for Mr. Acosta entered their appearances on April 8, 2005.

Ms. Medina did not report for supervised release the following day. Nor did she go to her brother's as she said she would. Instead, Ms. Medina stayed in a Denver motel for a night before leaving town. Upon returning to Denver, she had no permanent residence and bounced from one motel to another.

An arrest warrant for Ms. Medina issued almost three months later on July 1, 2005. Despite some efforts to locate her—which are detailed below—she was not found before Mr. Acosta's trial. The trial court ruled that Ms. Medina was "unavailable" and allowed her deposition transcripts to be read to the jury. Ms. Medina was arrested in Denver on unrelated charges on September 1, 2005, the same day the transcripts were read to the jury. The Denver Sheriff informed the Adams County Sheriff of Ms. Medina's arrest by fax on September 2, 2005, and again on September 6, 2005. There is no indication anyone who participated in the Adams

5

County investigation into Ms. Dotson's murder knew about Ms. Medina's arrest before September 7, 2005.

### B. *State-Court Trial*

Mr. Acosta's trial began on August 29, 2005. The prosecution called four lay witnesses and eight law enforcement witnesses. Brenda Masters testified that Ms. Dotson came to her house the day before the murder. Ms. Dotson told Ms. Masters she was scared that Mr. Acosta was going to kill her because she had wrecked his car.

Ben Medina met Mr. Acosta in jail.[2] Mr. Medina testified that Mr. Acosta told him he "killed some chick and threw her in a trash can" and the police "found his hand print and blood."

Favian Acevedo testified that when he went to the apartment the day after Ms. Dotson was slain, Mr. Acosta and Ms. Dillon admitted they killed Ms. Dotson and said they needed help with the body. Mr. Acevedo also attested that he saw Ms. Dotson's body wrapped in black bags and that he witnessed Mr. Acosta and Ms. Dillon put the lifeless body in the trash.

The prosecution also presented evidence that eight of Mr. Acosta's fingerprints and seven of his palm prints were on the trash bags in which Ms. Dotson's body was wrapped, and that four of his fingerprints were on a roll of tape that was used. Although Ms. Medina was unavailable to testify at trial, her deposition testimony

---

[2] Although Ben Medina and Patricia Medina have the same last name, they are not related and there is no indication in the record that they were acquainted.

featured prominently. The prosecution referenced her testimony during its opening statement, had her testimony read to the jury during its case-in-chief, and relied on her testimony during closing arguments to demonstrate Mr. Acosta was guilty of first- and second-degree murder. The jury convicted Mr. Acosta of first-degree murder and the court sentenced him to life without parole.

## C. *Direct Appeal*

Mr. Acosta appealed the judgment of conviction, alleging numerous violations of the Sixth Amendment. As relevant here, Mr. Acosta maintained the use of Ms. Medina's deposition testimony at trial violated his Confrontation Clause rights because Ms. Medina was not actually unavailable. According to Mr. Acosta, the prosecution simply failed to put forth sufficient effort to find her before trial. He also argued that he was denied the right to counsel at two critical stages during his case: (a) on March 31, 2005, when he waived his right to a speedy trial, and (b) on April 6, 2005, when Ms. Medina was released from custody.

First, the CCA held that the prosecution "engaged in good faith, reasonable efforts to produce [Ms. Medina] at trial, and that she was unavailable for Confrontation Clause purposes."

Second, the CCA held that Mr. Acosta was not denied his right to counsel (a) at the March 31, 2005 hearing because the trial court adequately advised him of his rights; or (b) at the April 6, 2005 hearing because that hearing was a ministerial—not a critical—stage of the criminal proceeding and thus neither Mr. Acosta nor his counsel was required to be present.

7

Additional details from the CCA's decision are provided below in connection with the legal issues presented.

### D. *Federal District Court*

On September 8, 2016, Mr. Acosta filed his 28 U.S.C. § 2254 Petition for a Writ of Habeas Corpus. As he did before the CCA, Mr. Acosta argued he was denied the right to confront witnesses against him and to the assistance of counsel.

The district court first ruled the hearings held on March 31 and April 6, 2005, were critical stages of the proceeding and therefore "the rulings of the [CCA] were unreasonable determinations of fact and unreasonable applications of the law." The court next concluded the CCA's determination that the prosecution engaged in good-faith efforts to produce Ms. Medina "is an unreasonable determination of the facts." But the court denied relief, concluding that the constitutional violations were neither structural errors requiring reversal nor harmful.

## II.     LEGAL STANDARDS

Before turning to the merits of Mr. Acosta's appeal, we provide (A) the standard of review and (B) an overview of the federal statute governing habeas relief.

### A. *Standard of Review*

We review the district court's "legal analysis of the state-court decision *de novo* and its factual findings, if any, for clear error." *Smith v. Duckworth*, 824 F.3d 1233, 1241–42 (10th Cir. 2016) (internal quotation marks omitted). We may affirm the district court "on any basis supported by the record." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).

8

## B. *AEDPA*

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires us to apply a "difficult to meet and highly deferential standard" in federal habeas proceedings under 28 U.S.C. § 2254, one that "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks omitted). When a petitioner includes in his habeas corpus application a "claim that was adjudicated on the merits in State court proceedings," a federal court shall not grant relief on that claim under § 2254 unless the state-court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1)–(2).

The statute's reference to "clearly established Federal law, as determined by the Supreme Court of the United States" "refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "Federal courts may not extract clearly established law from the general legal principles developed in factually distinct contexts, and Supreme Court holdings must be construed narrowly and consist only of something akin to on-point holdings." *Fairchild v. Trammell*, 784 F.3d 702, 710 (10th Cir. 2015) (internal quotation marks omitted).

9

A state-court decision is "contrary to" clearly established Supreme Court law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [that] precedent." *Williams*, 529 U.S. at 405–06. A state court need not cite, or even be aware of, applicable Supreme Court decisions, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

Moreover, a state-court decision is an "unreasonable application" of clearly established Supreme Court law if the decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407–08. While the term "unreasonable" is "difficult to define," "it is a common term in the legal world and . . . federal judges are familiar with its meaning." *Id.* at 410. And our inquiry is informed by the specificity of the governing rule: "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). But "[i]f a legal rule is specific, the range may be narrow" and "[a]pplications of the rule may be plainly correct or incorrect." *Id.* Importantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. Thus, a federal court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"; "that

10

application must also be unreasonable." *Id.* at 411. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

### III. DISCUSSION

On appeal, Mr. Acosta contends the district court applied the incorrect harmless-error standard and erred when it concluded the denial of counsel was not a structural error requiring reversal without a showing of prejudice. In response, the State argues the CCA reasonably held that: (1) the prosecution engaged in good-faith efforts to produce Ms. Medina at trial; and (2) the lack of counsel at the March 31, 2005 hearing was harmless, and the April 6, 2005 hearing was not a critical stage requiring the presence of counsel. We first address the Confrontation Clause issue before turning to the denial-of-counsel issue.

### A. *Confrontation Clause*

The district court ruled the CCA's holding that the prosecution's efforts were reasonable—and that Ms. Medina was therefore unavailable—was "an unreasonable determination of the facts." The district court identified several additional steps the prosecution should have taken to locate Ms. Medina. For example, it reasoned that the prosecution should have requested more restrictions at Ms. Medina's release hearing; the efforts to locate her should have begun immediately after her failure to appear the following morning; an arrest warrant should have issued long before July 1, 2005; and the local jails should have been contacted to see if she had been picked up for a street crime, as she ultimately was on September 1, 2005, during trial. But

11

the district court declined to grant Mr. Acosta any relief, concluding that the CCA reasonably determined that any error was harmless. In doing so, the court appeared to apply a sufficiency-of-the-evidence analysis. Mr. Acosta argues the district court erred by applying a sufficiency-of-the-evidence test instead of the harmless-error test mandated by *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

Recognizing we owe the district court's ruling no deference, the State argues the CCA's determination was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, nor based on an unreasonable determination of the facts. Thus, according to the State, we need not address the district court's harmless-error analysis, which it concedes was erroneous. We agree with the State.

### 1. Clearly Established Supreme Court Law

The Sixth Amendment's Confrontation Clause, made applicable to the states through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 406 (1965), provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," U.S. Const. amend. VI. The Clause prohibits the admission of testimonial hearsay against a defendant unless (1) the declarant is "unavailable" at trial and (2) the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004). We are here concerned with only the "unavailable" element.

The clearly established Supreme Court law for unavailability claims like the one here is found in *Ohio v. Roberts*, 448 U.S. 56 (1980), and *Barber v. Page*, 390 U.S. 719 (1968). *See Hardy v. Cross*, 565 U.S. 65, 69–70 (2011) (per curiam) (citing

12

*Roberts* and *Page* as the clearly established federal law in an AEDPA case about an unavailable witness). These decisions teach that "[a] witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain [her] presence at trial." *Roberts*, 448 U.S. at 74 (quoting *Barber*, 390 U.S. at 724–25). "The lengths to which the prosecution must go to produce a witness is a question of reasonableness." *Id.* (internal quotation marks omitted). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." *Id.*

"One, in hindsight, may always think of other things" the prosecution could have done. *Id.* at 75. But "[t]he law does not require the doing of a futile act." *Id.* at 74. "Thus, if no possibility of procuring the witness exists . . . , 'good faith' demands nothing of the prosecution." *Id.* If, however, "there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." *Id.* Contrary to the district court's assertion, whether the facts found concerning the prosecution's efforts to produce the witness support the legal conclusion that it acted in good faith is a mixed question of law and fact. *Cook v. McKune*, 323 F.3d 825, 831 (10th Cir. 2003). Under AEDPA, it is reviewed for an "unreasonable application of clearly established Federal law." *Id.*

Turning to that clearly established law, the Supreme Court in *Barber* held that the prosecution failed to engage in a good-faith effort to secure the presence of a declarant incarcerated in a federal penitentiary in a neighboring state. 390 U.S. at

13

723–25. Although the prosecution could have brought the declarant to court by seeking a writ of habeas corpus ad testificandum, the prosecution "made absolutely no effort to obtain [his] presence . . . at trial other than to ascertain that he was in a federal prison outside" the jurisdiction. *Id.* at 723–24.

In contrast, the Court held in *Roberts* that the prosecution had discharged its "duty of good-faith effort." 448 U.S. at 75. The prosecution issued five subpoenas to the witness at her parents' home in the four months before trial and spoke to her mother on multiple occasions. *Id.* at 59–60. During those conversations, the witness's mother told the prosecution that she had no knowledge of her daughter's whereabouts or of any "way to reach [her] even in an emergency." *Id.* at 75. The Court held that the prosecution's efforts were sufficient: "[i]t was [an] investigation at the last-known real address, and it was conversation with a parent who was concerned about her daughter's whereabouts." *Id.* at 76. The Court reached its conclusion of good faith even though the prosecution knew several months prior to trial that a social worker from San Francisco had called the mother after the witness had applied for government assistance, and thus the prosecution could have attempted to locate the social worker or otherwise taken additional steps to find the witness. *Id.* at 75. The Court concluded the prosecution was not required to undertake those additional steps, for "[o]ne, in hindsight, may always think of other things." *Id.* at 75. "[T]he great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralize[d] any intimation that a concept of reasonableness required their execution." *Id.* at 76.

14

## 2. The CCA's Determination

The CCA began its analysis of this issue by citing *Roberts* for the proper legal standard: "To show unavailability of a witness in the constitutional sense, the party asserting unavailability must show that good faith, reasonable efforts were made to produce the witness for trial, but without success." And it indicated, correctly, that "[g]ood faith does not require the exhaustion of every possible means of securing a witness's presence, especially if the means available appear futile or the witness is in a position to frustrate efforts to compel her attendance."

The CCA then highlighted the significance of Ms. Medina's testimony, noting that she was "the only eyewitness of the crime located by police" and that Mr. Acosta "was charged with[] first degree murder, [which] is a crime of utmost seriousness." It next reviewed the testimony of the two witnesses who testified about the prosecution's efforts to locate Ms. Medina at the evidentiary hearing held by the trial court.

> A.D. [an investigator for the district attorney's office] testified that she was assigned to locate and hand serve [Ms. Medina]. To this end, A.D. went to [Ms. Medina's] prior known address, the address listed on a traffic citation [Ms. Medina] received, and visited the post office nearest [Ms. Medina's] last known address to see if [Ms. Medina] filed a change of address form. Despite these efforts, A.D. testified that she was unable to locate [Ms. Medina].
>
> M.L. [a detective with the Westminster Police Department] testified about his knowledge of [Ms. Medina's] living situation and his prior conversations with [Ms. Medina]. Information from various sources indicated that she had no permanent residence and lived "on the streets" in the vicinity of East Colfax Avenue in Denver. [Ms. Medina] told M.L. that there was no location where he would be able to contact her, and that the best way to contact her was through her grandfather. M.L.

15

stated that he had a good rapport with the grandfather, who was "the one person from [Ms. Medina's] family who had been cooperative with the police." M.L. stated he had had "at least a half-dozen" bi-weekly conversations with the grandfather, seeking to locate [Ms. Medina], the most recent of which was two days before the hearing. M.L. had told the grandfather that if [Ms. Medina] contacted him, he was to call police and try to hold her so that police could pick her up.

M.L. also testified that he enlisted the aid of the Special Crime Attack Team (SCAT) unit of the police to search for [Ms. Medina]. The SCAT unit looked for her at the same Denver address at which she had earlier been arrested. They also looked for her on the streets in areas she was known to frequent. M.L. also made a search for her along Colfax Avenue.

Testimony of M.L. also established that police had been given information that [Ms. Medina] might have secreted herself in order to avoid testifying. Other information supplied to police indicated that a person who might have been her "pimp" might have been limiting her "freedom to come and go and that this guy was keeping a pretty good lid on her."

The CCA also recounted that Ms. Medina had twice failed to appear for hearings and had failed to comply with bond conditions, resulting in her being held in custody to ensure her appearance at Ms. Dillon's trial. It also observed that once released, Ms. Medina again disappeared.

In view of these findings, the CCA concluded that "the People engaged in good faith, reasonable efforts to produce [Ms. Medina] at trial, and that she was unavailable for Confrontation Clause purposes." In reaching that conclusion, the CCA rejected Mr. Acosta's argument that the prosecution could have done more, stating, "good faith may not require the exhaustion of *every* possible means of securing the witness's presence, especially if the means available appear futile, or if the witness may be in a position to frustrate

16

efforts to compel her attendance." The CCA further noted that Mr. Acosta "offers nothing to indicate that [Ms. Medina], who disregarded previous subpoenas to appear, would have obeyed a subpoena issued by the People." Finally, it declined "to adopt a holding that would require a witness, such as [Ms. Medina], who has a demonstrated propensity not to appear, to be held in custody for over five months solely to ensure attendance at trial."

### 3. Analysis

Although not entirely clear, Mr. Acosta seems to urge us to apply de novo review to the unavailability issue. But the CCA resolved this issue on the merits, so we must apply AEDPA's deferential standard of review. *See* 28 U.S.C. § 2254(d). Under that standard, Mr. Acosta must establish that the CCA unreasonably applied clearly established Supreme Court law when it concluded the prosecution engaged in reasonable, good-faith efforts to produce Ms. Medina at trial.

As we now explain, we hold that the CCA correctly articulated the controlling Sixth Amendment standard, accurately summarized the investigators' pretrial testimony about their efforts to find Ms. Medina, and reasonably concluded the prosecution engaged in good-faith efforts to produce Ms. Medina at trial. Recall that the investigators:

- checked Ms. Medina's last known addresses;

- visited the post office to see if Ms. Medina had filed a change of address form;

- obtained information from "various sources" indicating Ms. Medina had no permanent residence, lived on the streets, and was in hiding to avoid testifying;

17

- spoke twice a week with Ms. Medina's grandfather, who was "the one person from [her] family who had been cooperative with police";

- enlisted the aid of the SCAT unit, which looked for Ms. Medina at her prior Denver address and on the streets in areas she was known to frequent; and

- personally searched for Ms. Medina along Colfax Avenue.

Unlike *Barber*, the prosecution did far more than make "absolutely no effort" to obtain Ms. Medina's presence at trial. *See* 390 U.S. at 723. And like *Roberts*, the prosecution investigated Ms. Medina's last known addresses, investigated whether Ms. Medina had changed addresses, and spoke with a concerned relative on multiple occasions. *See* 448 U.S. at 75–76. Whether the prosecution made a good-faith effort is a question of reasonableness. *See id.* at 74. The standard is a general one, so the range of reasonable applications is substantial. *See Meras v. Sisto*, 676 F.3d 1184, 1191 (9th Cir. 2012) (Bea, J., concurring in part and concurring in judgment) (determining whether the prosecution made a good-faith effort to produce a witness is "hard," because the Court has "rarely addressed what it means to be 'unavailable' for Confrontation Clause purposes"); *cf. Harrington v. Richter*, 562 U.S. 86, 105 (2011) (noting the "reasonableness" standard for ineffective-assistance-of-counsel claims is "a general one, so the range of reasonable applications is substantial"). The CCA's holding that the prosecution engaged in a good-faith effort to produce Ms. Medina at trial falls within that range of reasonable applications. *See Williams v. Taylor*, 529 U.S. 362, 410 (2000) (stating "an *unreasonable* application of federal law is different from an *incorrect* application of federal law").

18

Mr. Acosta and the district court believe the CCA's conclusion is unreasonable because the prosecution failed to undertake several other steps it could have taken to find her. Their arguments are unavailing.

First, Mr. Acosta and the district court fault the state trial court for not imposing more restrictions on Ms. Medina or obtaining more information about her brother and her future whereabouts. Mr. Acosta also argues that the trial court should have kept Ms. Medina detained until his new counsel entered their appearances. And Mr. Acosta insists it was reckless for the trial court to release Ms. Medina as a "test" in view of her prior failures to appear. But the issue is not whether the court should have imposed more restrictions on Ms. Medina, obtained more information, or kept her detained; the issue is, after Ms. Medina was released, whether the prosecution engaged in good-faith efforts to produce her at trial. *See Roberts*, 448 U.S. at 74.

Second, Mr. Acosta argues the prosecution had other information or leads it did not pursue. For instance, the prosecution did not visit Ms. Medina's grandfather's house; did not check her arrest records, which would have revealed that she had been arrested on September 1, 2005, the same day her deposition testimony was read to the jury;[3] did not contact or visit her mother, sister, or brother; and did not speak with the officer who spoke to her four days after the murder.

But the Sixth Amendment does not require the prosecution to exhaust every possible means of producing a witness at trial. *See Roberts*, 448 U.S. at 75; *see also*

---

[3] This argument also fails because the focus is on whether the prosecution made good-faith efforts to produce the witness "*prior to trial*," not during trial. *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (emphasis added).

19

*Hardy*, 565 U.S. at 71. Indeed, in *Roberts*, the Court held the prosecution engaged in good-faith efforts to produce the witness, even though the prosecution had a lead it did not pursue: it knew a social worker in San Francisco had called the witness's mother, yet the prosecution did not attempt to locate the social worker or take other steps to find the witness in San Francisco. 448 U.S. at 75–76. Similarly, here, the prosecution's failure to take additional steps does not render its efforts unreasonable, especially under AEDPA's deferential standard of review. The "deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken." *Hardy*, 565 U.S. at 72. "[I]f the state-court decision was reasonable, it cannot be disturbed." *Id.* Here, the CCA reasonably applied clearly established Supreme Court law when it determined Ms. Medina was unavailable at the time of trial. Thus, its decision cannot be disturbed.[4]

### B. *Denial of Counsel*

The district court ruled the CCA unreasonably held that Mr. Acosta was not denied counsel at (1) the March 31, 2005 hearing where Mr. Acosta waived his statutory right to a speedy trial, and (2) the April 6, 2005 hearing where the trial court released Ms. Medina on supervised release. The district court explained Ms. Medina

---

[4] Because we conclude the CCA did not err, we need not address whether the district court applied the incorrect harmless-error standard to Mr. Acosta's Confrontation Clause claim.

20

was a crucial witness and "keeping her in custody was critical to the opportunity to confront her testimony with a live cross-examination." It concluded "[t]he importance of the right of confrontation of this critical witness weighs heavily in favor of a finding that these were critical stages of this prosecution and warrants a determination that the rulings of the [CCA] were unreasonable determinations of fact and unreasonable applications of the law." But the court declined to grant relief, concluding the denial-of-counsel violations were neither structural nor harmful errors.

On appeal, Mr. Acosta argues the district court erred because the denial-of-counsel violations are structural errors requiring reversal without a showing of prejudice. He also argues that, even if those violations are subject to harmless-error analysis, the district court erred by failing to apply the *Brecht* test. In response, the State argues the CCA reasonably applied clearly established Supreme Court law when it determined that Mr. Acosta was not deprived counsel at (1) the March 31, 2005 hearing because the absence of counsel was harmless, and (2) the April 6, 2005 hearing because that proceeding was not a critical stage. Assuming for purposes of analysis that the CCA unreasonably applied clearly established Supreme Court law when it held Mr. Acosta was not denied counsel at the two hearings, we conclude the violations were neither structural nor harmful errors.

## 1. Clearly Established Supreme Court Law

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const.

21

amend. VI. The Supreme Court has interpreted this provision as guaranteeing a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227–28 (1967). A critical stage is a proceeding between a defendant and an agent of the state—whether "formal or informal, in court or out," *id.* at 226—that amounts to a "trial-like confrontation[]," at which counsel can "aid in coping with legal problems or [provide] assistance in meeting his adversary," *United States v. Ash*, 413 U.S. 300, 312–13 (1973). *See Rothgery v. Gillespie Cty.*, 554 U.S. 191, 212 n.16 (2008).

In some of its earlier decisions, the Supreme Court had held that the assistance of counsel "is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'" *Holloway v. Arkansas*, 435 U.S. 475, 489 (1978) (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)). For example, the *Holloway* Court stated that, "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic." *Id.* And in *United States v. Cronic*, 466 U.S. 648, 659 (1984), while discussing when a defendant need not show a constitutional violation caused him to suffer prejudice, the Court said: "Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." *See also id.* at 659 n.25 ("The Court has uniformly found constitutional error without any showing

22

of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.").

More recently, however, the Court has explained that not all constitutional violations, including Sixth Amendment violations, require automatic reversal. *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988). Some violations may be subject to harmless-error analysis. *Id.* Whether an error requires automatic reversal or may be subject to harmless-error analysis depends on whether it is a "structural error" or a "trial error." *Brecht*, 507 U.S. at 629–30. Structural error—which requires automatic reversal—involves a defect in the "trial mechanism" that "infect[s] the entire trial process," *id.*, affecting "the framework within which the trial proceeds" "from beginning to end," *Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991). Trial error—which is subject to harmless-error analysis—occurs "during the presentation of the case to the jury, and is amenable to harmless-error analysis because it may be quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial." *Brecht*, 507 U.S. at 629 (internal quotation marks omitted).

In *Satterwhite*, the Court explained that "Sixth Amendment violations that pervade the *entire* proceeding" "can never be considered harmless." 486 U.S. at 256 (emphasis added). As a result, Sixth Amendment structural error exists when "the deprivation of the right to counsel affected—and contaminated—the entire criminal proceeding." *Id.* at 257; *see, e.g.*, *Penson v. Ohio*, 488 U.S. 75, 88–89 (1988) (presuming prejudice where there was a complete denial of counsel on appeal);

23

*Holloway*, 435 U.S. at 490–91 (rejecting request to conduct harmless-error analysis and instead automatically reversing where a conflict of interest in representation existed throughout the entire proceeding); *White v. Maryland*, 373 U.S. 59, 60 (1963) (per curiam) (automatically reversing where the absence of counsel from the arraignment proceeding affected the entire trial because defenses not asserted were irretrievably lost); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (same). To the contrary, Sixth Amendment violations that do not pervade the entire proceeding are subject to harmless-error review. *See, e.g.*, *Satterwhite*, 486 U.S. at 258 (applying harmless-error review where psychiatric testimony was admitted at a capital sentencing in violation of the Sixth Amendment); *Coleman v. Alabama*, 399 U.S. 1, 9–11 (1970) (requiring harmless-error review where defendant was denied counsel at the preliminary hearing but the prosecution was prohibited from using anything that occurred at that hearing at trial); *see also United States v. Lott*, 433 F.3d 718, 722–23 (10th Cir. 2006) (summarizing when an error is structural versus when an error is subject to harmless-error review).

When harmless-error review applies, the type of analysis required depends on whether the issue comes to us on direct appeal or on federal habeas review. *See Brecht*, 507 U.S. at 623. When the issue comes on direct appeal, the *Chapman* harmless-error standard applies. *Id.* at 622–23. Under that standard, the inquiry is whether the state has proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Satterwhite*, 486 U.S. at 258–59 (quoting *Chapman*, 386 U.S. at 24). When the issue comes to us on habeas review, however,

24

we must apply the less-onerous *Brecht* standard. *Brecht*, 507 U.S. at 623. Under that standard, the inquiry is whether the constitutional violation "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "[T]he *Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015).

## 2. The CCA's Decision

The CCA first laid out the general rule that "[a] criminal defendant has the right to counsel at every critical stage of a proceeding." It next defined a "critical stage" as any stage "where there exists more than a 'minimal risk' that the absence of the defendant's counsel might impair the defendant's right to a fair trial." Then citing *Von Moltke v. Gillies*, 332 U.S. 708, 723 (1948) (plurality opinion), the CCA explained that "[t]he constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel." And that to discharge this duty, the trial court must investigate "as long and as thoroughly" as the circumstances demand to determine whether the strong presumption against waiver of the constitutional right to counsel has been overcome.

The CCA then analyzed the March 31, 2005 hearing, concluding that no Sixth Amendment violation had occurred:

25

[W]hen the Public Defender's Office withdrew as defense counsel, the trial court advised [Mr. Acosta] that in order to preserve his constitutional right to counsel, he would have to waive his statutory right to speedy trial. The trial court then determined that [Mr. Acosta] made a knowing, voluntary, and intelligent waiver of his statutory speedy trial right. Given the unequivocal indication by the Public Defender's Office that it had an irreconcilable conflict in its representation of [Mr. Acosta], the court was required to appoint alternative counsel for [him]. And to enable new defense counsel to prepare adequately for trial in this first degree murder case, the court appropriately granted a continuance. In these circumstances, the trial court's advisement to [Mr. Acosta] was sufficient to protect [his] constitutional rights. Therefore, we conclude that although [Mr. Acosta] was not represented by counsel when he waived his speedy trial right, the trial court's inquiry was sufficient to protect his constitutional rights, and thus [Mr. Acosta's] Sixth Amendment right to counsel was not violated.

The CCA then turned to the April 6, 2005 hearing:

At the hearing, the trial court discussed with [Ms. Medina] her prior disappearances after being released from custody and told her that she would be put back in jail if she did not report as required, and that the district attorney would provide her with transportation to the court to help ensure her attendance at trial. The court then released [Ms. Medina] on a personal recognizance bond.

A similar issue was presented to a division of this court in *People v. Moltrer*, 893 P.2d 131 (Colo. App. 1994). In that case, neither the defendant nor his counsel was present at a hearing concerning a material witness's appearance. Addressing the defendant's argument that this was a critical stage of the criminal action and that by not having him or his counsel present, his right to counsel was violated, the division held that this was a ministerial stage, not a critical stage of the criminal action, and thus there was no violation. *Id.* at 1333. We agree with the reasoning in *Moltrer* and adopt it here.

Ultimately, the CCA concluded that the hearing on Ms. Medina's release "was not a critical stage of [Mr. Acosta's] criminal proceeding and thus neither his presence nor that of his counsel was required."

### 3. Analysis

The district court ruled the CCA unreasonably rejected Mr. Acosta's claim that he was denied counsel at the March 31, 2005 hearing where he waived his statutory right to a speedy trial, and at the April 6, 2005 hearing when the trial court released Ms. Medina on supervised release. Mr. Acosta urges us to adopt this conclusion, but to correct the district court's harmless-error analysis, arguing the denial of counsel was structural error requiring automatic reversal. He also maintains that, even if the denial of counsel was not structural error, he is entitled to relief because the error was not harmless under *Brecht*.

Following Mr. Acosta's lead, we assume without deciding that the district court correctly ruled the CCA unreasonably rejected Mr. Acosta's claim that he was denied counsel at the two hearings. The question, then, is whether these errors, either individually or together, constitute structural error triggering automatic reversal. As stated, structural error exists when "the deprivation of the right to counsel affected—and contaminated—the entire criminal proceeding." *Satterwhite*, 486 U.S. at 257. The Sixth Amendment cases finding structural error generally involve a complete denial of counsel during the entire criminal proceeding. But here, while Mr. Acosta may have been denied counsel at the two hearings, he had counsel for the remainder of his criminal proceeding, including trial and sentencing. Mr. Acosta maintains the errors contaminated the entire proceeding because "[t]he denial of counsel violations are the 'but for' causes that led to [his] loss of his confrontation right." He explains:

27

> *But for* [Mr.] Acosta waiving speedy trial on March 31, [Ms.] Medina would not have been released; *but for* her release on April 6[,] she would not have disappeared; *but for* her disappearance, her deposition would not have been used at trial; *but for* her deposition being used at trial, [Mr.] Acosta would not have lost his right of confrontation and could not have been convicted of first degree murder.

Thus, Mr. Acosta premises his "contamination" argument on the existence of a Confrontation Clause violation. But as explained above, the CCA reasonably applied clearly established Supreme Court law when it concluded that Ms. Medina was unavailable and that Mr. Acosta's right to confrontation was not violated.

To the extent Mr. Acosta contends his deprivation of counsel at the March 31, 2005 hearing caused the loss of an identified right because he waived his right to a speedy trial, he does not contest the trial court's conclusion that he knowingly and intelligently waived that right. And he fails to explain how that waiver affected and contaminated the entire criminal proceeding, aside from insisting it resulted in a Confrontation Clause violation. We conclude that the denial of counsel at the two hearings is not structural error.

Having concluded that automatic reversal is inappropriate, we must next determine whether the denials of counsel were harmless, i.e., whether they had a "substantial and injurious effect or influence" on the verdict. *Brecht*, 507 U.S. at 623 (internal quotation marks omitted). We are convinced that the lack of counsel at both hearings, and Mr. Acosta's waiver of his statutory right to speedy trial, had no impact on the verdict. Mr. Acosta's new counsel entered their appearances on April 8, 2005, and they continued to represent him during trial and sentencing. Mr. Acosta does not

contend he received inadequate representation during those stages. He instead argues the errors were harmful because they resulted in the admission of Ms. Medina's deposition transcripts in violation of his right to confrontation. In other words, he again premises his argument on the admission of the transcripts and their effect on the verdict. But because the CCA reasonably held that Ms. Medina was unavailable, that the transcripts were properly admitted at trial, and that Mr. Acosta's right to confrontation was not violated, we conclude that any error was harmless.

## IV. CONCLUSION

We affirm the district court's judgment denying Mr. Acosta's 28 U.S.C. § 2254 petition.